**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Ex Parte: South Carolina Department of Mental Health, Appellant.

In re:

The State, Respondent,

v.

Jevon Kenneth Carter, Respondent/Appellant.

Appellate Case No. 2023-001766

————————

Appeal From Greenville County
Alex Kinlaw, Jr., Circuit Court Judge

————————

Unpublished Opinion No. 2026-UP-022
Heard November 12, 2025 – Filed January 28, 2026

————————

**AFFIRMED**

————————

R. Alexander Pate, II and Logan Y. Royals, of Columbia, for Appellant.

D. Josev Brewer, of Greenville, for Respondent/Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General J. Benjamin Aplin, of Columbia, and Solicitor W. Walter Wilkins, III, of Greenville, all for Respondent.

---

**PER CURIAM:** Jevon Carter (Carter) was found not guilty by reason of insanity (NGRI) for the July 4, 2020, murder of his 93-year-old great aunt. He was committed to the South Carolina Department of Mental Health (DMH) following a bench trial and transferred to DMH's physical custody on August 16, 2022. DMH has twice recommended his discharge from inpatient treatment: first at a hearing on December 8, 2022, and again during a hearing on August 30, 2023. At both hearings, DMH's expert witnesses testified Carter had insight and capacity to make responsible decisions with respect to his treatment and was not likely to cause serious harm to himself or others if he was released. On both occasions, the circuit court denied DMH's request to discharge him to his home. Both DMH and Carter appeal the most recent order and argue he should be discharged from inpatient treatment. We affirm.

## FACTS

Carter was nineteen years old and had no criminal record when his mental health issues manifested. He was first admitted for inpatient psychiatric treatment on July 2, 2020. The same day, Carter demanded to leave, jumped over the nurse's station, barricaded the door to his room, and tried to break out the window.

On July 4, 2020, Carter successfully eloped from inpatient treatment by walking out of an open door to the patio area of the hospital and scaling the surrounding fence. The same night, Carter broke into the home of his elderly great aunt and fatally stabbed her in the neck with a knife from her own kitchen. Carter fled the scene without being detected, but reappeared the following day at the emergency room. He was returned to inpatient treatment where he again attempted to elope by trying to break out his bedroom window. On July 8, 2020, Carter successfully eloped from inpatient treatment a second time by forcing open a glass door. Law enforcement located him at his father's house and transported him to the ER, where he was

recommitted for inpatient treatment.  His treating physicians ordered treatment staff to observe Carter one-on-one due to his high risk of elopement and his "poor insight and poor compliance with medications."  Nurses noted during this time that Carter was regurgitating his prescribed psychiatric medications.

Carter stabilized enough to be discharged on July 22, 2020, with a diagnosis of bipolar disorder "with mood congruent psychotic features."  Five days later, police brought Carter to the ER with an altered mental status after he was pulled over for driving erratically and found in possession of cannabis.  Carter was admitted to the hospital and discharged on July 29, 2020.

Carter was arrested for the murder of his great aunt on August 28, 2020, after police matched his palm print to a broken window and found his DNA at her home. Carter was subsequently indicted for murder, first-degree burglary, and possession of a weapon during the commission of a violent crime.  He remained in the Greenville County Detention Center (GCDC) until he was found NGRI at his bench trial on June 8, 2022.[1]  In his final six months at GCDC, jail records indicate he refused his medications on fifty separate occasions.

The DMH review board met on November 4, 2022, and subsequently recommended that Carter be discharged from inpatient services and returned home to live with his mother.  On December 8, 2022, a discharge hearing was held in front of Circuit Court Judge Perry Gravely.   Dr. Jennifer Alleyne testified as Carter's treating psychiatrist.  She testified Carter had "very good insight" into his mental illness, and demonstrated an understanding of his symptoms, his medications, and their potential side effects.  Dr. Alleyne described Carter as kind, caring, and polite.  She testified he had been compliant with taking his medications since his admission and had not had any incidents of aggression or behavioral disturbances either at the jail or during his hospitalization.  She further testified to a reasonable degree of medical certainty she did not think Carter presented a danger to himself or to others.  Dr. Alleyne recommended that he be discharged to live with his mother and receive outpatient therapy.  She testified he would need a

---

[1] On August 16, 2022, bed space became available, and Carter was transferred to DMH custody.

structured and supervised living environment, meaning a "stable home with people to support him and assist him in getting to his appointments and making sure he is participating in treatment properly." The proposed discharge order required Carter to remain compliant with taking his medications, to abstain from the use of alcohol or illegal drugs, and to be subject to random drug screens. Dr. Alleyne did not believe Carter would benefit from remaining in inpatient treatment and she did not recommend placing Carter in a supervised community residential care facility (CRCF) because she felt he was higher functioning than most of the other residents.

Judge Gravely denied DMH's request to discharge, citing Carter's prior noncompliance with prescribed medications, his history of elopements from custody, and his commission of a violent offense during one such elopement. Judge Gravely further noted that Carter had been housed at DMH for only eighty days before the review board recommended his discharge, that his mother had previously failed to supervise him, and that she had significant mental health, substance abuse, and legal issues of her own. The order stated, "If []DMH determines [Carter] should be released at some point in the future, then a more appropriate treatment plan regarding supervision of [Carter] will need to be provided, including the consideration of transitional housing and a more stable environment with appropriate monitoring and supervision."

Following a subsequent review board meeting on June 23, 2023, DMH again petitioned the court requesting Carter's discharge. A hearing took place on August 30, 2023, before Circuit Court Judge Alex Kinlaw. At the second discharge hearing, Dr. Alleyne testified substantially the same as in the first hearing. She told the court that Carter continued to be a model patient and remained compliant with his medications. She testified to Carter's good insight into his mental health condition and that he would be able to treat his mental health condition on an outpatient basis. She also testified he was not likely to cause serious harm to himself or others if discharged.

In response to the circuit court's prior refusal to discharge Carter to his mother, DMH recommended in the second proposed order that he be discharged to live with his maternal grandmother, Cynthia Chapman. Chapman lives directly next door to Carter's mother. Dr. Alleyne performed a virtual tour of Chapman's residence and found it a fit residence for Carter. DMH provided the court with no further information about Chapman.

Dr. Richard Frierson also testified on behalf of DMH.  Dr. Frierson, a professor of psychiatry at the University of South Carolina School of Medicine, performed a forensic violence risk assessment on Carter.  He testified that out of any of his patients he assessed for DMH, Carter was the least prone to violence.  Dr. Frierson agreed that Carter's discharge to his grandmother's house, rather than a CRCF, was appropriate because Carter was very high functioning: he had social skills, could make conversation, and could maintain his own hygiene and grooming.  Dr. Frierson opined that Carter would function better in an environment that offered him opportunities to socialize with others who had similar social skills and allowed him to continue his education.

Judge Kinlaw denied DMH's request for discharge and ordered Carter's continued inpatient treatment, finding by clear and convincing evidence that he was still in need of inpatient treatment because he was "mentally ill, needs involuntary treatment; and because of his condition lacks insight or capacity to make responsible decisions regarding treatment; and there is a likelihood of serious harm to himself or others."  Neither Carter nor DMH filed a motion to alter or amend the judgment.  This appeal followed.

**STANDARD OF REVIEW**

When reviewing an action at law, on appeal of a case tried without a jury, this court will not disturb the judge's findings of fact "unless found to be without evidence which reasonably supports the judge's findings."  *In re Treatment & Care of Luckabaugh*, 351 S.C. 122, 131, 568 S.E.2d 338, 342 (2002) (quoting *Townes Associates, Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976)).  "However, an appellate court may make its own determination on questions of law and need not defer to the trial court's rulings in this regard."  *Nationwide Mut. Fire Ins. Co. v. Walls*, 433 S.C. 206, 212, 858 S.E.2d 150, 153 (2021) (quoting *South Carolina Farm Bureau Mut. Ins. Co. v. Kennedy*, 398 S.C. 604, 610, 730 S.E.2d 862, 864 (2012)).

**LAW/ANALYSIS**

"Defendants adjudicated NGRI . . . are not considered 'prisoners' as they have not been found guilty of a crime."  *Interagency Protocol for Defendants Found Not Guilty by Reason of Insanity*, Admin. Order No. 2014-04-24-01 (S.C. Sup. Ct. Order dated April 24, 2014).  Continued hospitalization of an

individual who has been committed pursuant to a finding of NGRI is governed by section 17-24-40 of the South Carolina Code (2014). Once a verdict of NGRI is returned, "the trial judge must order the person . . . committed to the South Carolina State Hospital for a period not to exceed one hundred twenty days. During that time an examination must be made to determine the need for hospitalization . . . ." § 17-24-40(A). "A report of the findings must be made to the chief administrative judge of the circuit in which the trial was held, the solicitor, the [defendant], and the [defendant's] attorney." § 17-24-40(B). Within fifteen days of receiving the report, the court "must hold a hearing to decide whether the person should [remain] hospitalized . . . ." § 17-24-40(C)(1). If the judge "finds the person to be in need of hospitalization, the judge must order the person committed to the South Carolina State Hospital." § 17-24-40(C)(2)(b).

If his treating doctors later determine "the person is no longer in need of hospitalization, [they] must notify the chief administrative judge, solicitor, [defendant], and [defendant's] attorney." § 17-24-40(C)(2)(c). Within twenty-one days of receiving the notice, the judge "must hold a hearing to determine whether the person is in need of continued hospitalization pursuant to the standard[s] of Section 44-17-580." *Id.*

> If the finding of the court is that the person is in need of continued hospitalization, the court *must* order his continued confinement. If the court's finding is that the person is not in need of continued hospitalization, it *may* order the person released upon such terms or conditions, if any, as the chief administrative judge considers appropriate for the safety of the community and the well-being of the person.

*Id.* (emphases added).

The court must order the person's continued hospitalization if it finds by clear and convincing evidence that the person is mentally ill, needs involuntary treatment and because of his condition: "lacks sufficient insight or capacity to make responsible decisions with respect to his treatment; or [] there is a likelihood of serious harm to himself or others." S.C. Code Ann. § 44-17-580(A) (2018).

Any terms or conditions of discharge from the hospital must be therapeutic rather than punitive and must include that the person: "(1) continue taking medication for an indefinite time and verify in writing the use of medication; (2) receive periodic examinations and reviews by psychiatric personnel; and (3) report periodically to the probation office for an evaluation of his reaction to his environment and his general welfare." § 17-24-40(D). The court may also include "provisions for the safety of the community in general and the victim in particular, including 'no contact' strictures, specific housing requirements, and curfew restrictions." *Interagency Protocol for Defendants Found Not Guilty by Reason of Insanity*, Admin. Order No. 2014-04-24-01 (S.C. Sup. Ct. Order dated April 24, 2014).

Both Carter and DMH appeal Judge Kinlaw's order denying Carter's discharge. They argue there was clear and convincing evidence that his hospitalization was no longer required since the only expert testimony presented at the hearing supported his discharge. They also argue Judge Kinlaw's order is not supported by findings of fact.

The State argues that it was not required to present expert testimony where it vigorously cross-examined DMH's experts and pointed out Carter's previous history of noncompliance and elopement. The State also points out the statute contains mandatory language where the court finds the defendant in need of continued hospitalization but contains only discretionary language where the court finds the defendant is no longer in need of hospitalization. *Compare* S.C. Code Ann. § 17-24-40(b) ("[T]he judge must order the person committed" to the hospital) *with* § 17-24-40(c) (The court "may order" the person released.). The State also argues Judge Kinlaw's order is supported by the record and that neither Carter nor DMH filed a motion to alter or amend the judgment requesting that he make findings of fact. *See USAA Property and Cas. Ins. Co. v. Clegg*, 377 S.C. 643, 652, 661 S.E.2d 791, 795 (2008) (finding where trial judge's ruling was silent regarding the basis for its decision, it was incumbent upon the aggrieved party to file a Rule 59(e) motion requesting the court provide specific factual findings for its decision).

We find there is sufficient evidence to support the circuit court's decision. Considering all the evidence in the record, the court's hesitation to release Carter to his grandmother's care after only a short period of compliance is understandable: he has a history of elopements from custody, a history of

refusing his medications, and he committed an extremely violent offense during a previous elopement. In addition, DMH provided the court with very little information about his grandmother. Dr. Alleyne performed only a "virtual tour" of her residence and gave no information to the court about how she might be equipped to provide the "stable environment" Carter requires. The record contains no information about her age or health condition, whether she works or is retired, or whether she has a positive relationship with Carter. These are facts which would seem of obvious importance to the court for both her safety and Carter's. While the State did not present its own expert witness, the statutory scheme does not require the State to do so. Rather, the statute contemplates that the hearing judge will consider the expert testimony and then exercise independent discretion. Otherwise, there would be no need for a judicial hearing and DMH would be free to make decisions regarding treatment and release without court approval.

## CONCLUSION

Carter has clearly done well during the relatively brief period he has been hospitalized, and he has without a doubt made a positive impression upon hospital staff. While he is medicated, he appears to be a model patient. However, given his history of elopements and medication noncompliance, we find no error in the circuit court's decision to require Carter to have a longer period of psychiatric stabilization before he is released. Given the high stakes for both Carter and his family, we believe the court's caution was justified. For these reasons, the order of the circuit court is

**AFFIRMED.**

**WILLIAMS, C.J., and THOMAS and CURTIS, JJ., concur.**